UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DAVID J. CARPENTER            :
    and                                            Hon. Joseph H. Rodriguez
 SUSAN CARPENTER, h/w       :

      Plaintiffs,              :          Civil Action No. 18-10959

    v.                              :               OPINION

PATROLMAN ALBERT              :
CHARD, JR., CHIEF OF POLICE
 JODY FARABELLA, and CITY     :
OF MILLVILLE,  NEW JERSEY,
THROUGH ITS POLICE            :
DEPARTMENT
                               :
      Defendants.
                               :

This matter comes before the Court upon the Motion for Summary

Judgment filed by Plaintiffs, Mr. David J. Carpenter ("Carpenter") and Mrs.

Susan Carpenter [Dkt. No. 29,] and the Motion for Summary Judgment

filed by Defendants, Patrolman Albert Chard, Jr., Chief of Police Jody

Farabella, and City of Millville, New Jersey, Through Its Police Department.

[Dkt. No. 30.] The Court has reviewed the written submissions of the

parties and considered the arguments advanced at the hearing on

September 22, 2020.  For the reasons set forth below, as well as those set

forth on the record during the hearing, Plaintiffs' Motion [Dkt. No. 29] will be granted and Defendants' Motion [Dkt. No. 30] will be denied.

## I.   <u>Background</u>

On January 22, 2018, at approximately 3:16 p.m., uniformed Millville Police Chard ("Chard") was on foot directing traffic at the intersection of High and Foundry Streets, in the City of Millville, New Jersey. [Dkt. No. 1 "Complaint" at Exhibit A "Investigation Report."] Chard observed Carpenter operating a red Ford pickup truck. [<u>Id.</u>] As Carpenter drove, he "filmed the police action on his cellphone." [<u>Id.</u>] Chard made a downward motion for Carpenter to put down his phone. [<u>Id.</u>] These facts are not contested.

In the video Carpenter was capturing at the time of the incident, Carpenter can be heard saying, "What? No, no, no, I don't have to," in response to Chard's motion. [Dkt. No. 30-3 at Exhibit 1.] After which, the video captures a sound and a potential image of Chard attempting to open Carpenter's vehicle on the front passenger-side door. [<u>Id.</u>]  Chard does not contest that he was attempting to open the door <u>See</u> Exhibit K (Investigation Report) at 2. Carpenter can be heard saying, "[o]kay, okay," before stopping his truck. [Dkt. No. 30-3 at Exhibit 1.] Chard then appears at the driver's side window and both he and Carpenter appear to be

distressed. [Id.] Chard orders Carpenter to "put the phone down" and "turn the car off." [Id.] Carpenter states, "Hey, you want a lawsuit?" to which Chard replies, "You want to get arrested?" As tensions increase, Carpenter called 9-1-1 from inside his vehicle. [Id.] Carpenter was soon after notified he would be placed under arrest. [See Investigation Report.]

Following the incident, Chard drafted a police investigation report which in part stated:

> The defendant was arrested, processed, and charged on summons 0610/S 2018 000134 for 2C:29-1A (Obstruction); 2C:33-1E (Calling 911 without the need for 911 service); and 2C:12-1C (a) (Assault by Auto). The defendant was released following processing. A VINE form was filled out along with the CJP paperwork.
>
> The following traffic summons were issued as well:
>
> 214402 39:4-97.3 Cell Phone Use While Driving
> 214403 39:4-80 Failure to Obey Police Officer Directing Traffic
> 214404 39:4-126 Failure to Use Proper Turn Signal
> 214405 39:4-97 Careless Driving.
>
> [See Investigation Report.]

The Police Report describes an incident where Chard was purposefully dragged by Carpenter's vehicle: "As soon as I grabbed the handle the driver attempted to pull away with my hand still attached. I was unable to let go fast enough and was dragged across High Street to the east near the southeast corner." See Exhibit K (Investigation Report) at 2.

3

Chard, then submitted a signed Affidavit of Probable Cause. [ See Dkt. No. 30-3 at Exhibit 4, "Affidavit of Probable Cause."] The Affidavit provided the factual basis of the charges, including the description of the traffic incident, the circumstances of the offense of Carpenter's 9-1-1 call to request a supervisor for alleged harassment by police, and Chard's statement of the extent of the injury he sustained. [Id. at 9-10.]

On February 7, 2018, Chard was called to testify before a grand jury by the Cumberland County Prosecutor's Office. [See Compl. at Exhibit C "Grand Jury Panel Transcript."] Assistant Prosecutor Tonnisen questioned Chard with the following exchange:

Q: While you were holding the door handle, did he drive which dragged you across the street?
A: Yes.

See Exhibit M (Grand Jury Transcript) at 5. Thereafter, the grand jury returned indictments against Carpenter for Aggravated Assault on a Police Officer – Third Degree (N.J.S.A. 2C:12-1b(5)(a)); and Eluding – Third Degree (N.J.S.A. 2C:29-1b). [Id.]

On April 2, 2018, at a plea and sentencing hearing in the Cumberland County Superior Court, Judge Michael Silvanio accepted a plea agreement. [See Dkt. No. 30-3 at Exhibit 5, "Transcript of April 2, 2018, Superior Court Plea Hearing and Sentence."] All of the charges, except the charge for Cell

Phone Use While Driving, were dismissed by the State in exchange for the plea because the prosecutor found that he had "no factual" support for the remaining charges. [See Exhibit I (Transcript) at 4; Exhibit N (Plea Form). This is the colloquy between the prosecute and the court as to the merits of the plea agreement:

> MR. HERNDON: However, with respect to the Indictment, we did look at several videos, including the Defendant's cell phone video that he was using while driving, filming the incident. We also did pull several surveillance videos after that. Had made a determination, me and my supervisors, that after viewing the video, that there were no indictable level offenses to which Carpenter should have been indicted for. I believe he was indicted for Aggravated Assault on a Law Enforcement Officer as one of the offenses, and again, there was, in the State's view, no factual for that. So we're agreeing to dismiss the Indictment in exchange for Carpenter to plead guilty to the motor vehicle violation of Operating a Cell Phone While Driving a Motor Vehicle.
>
> THE COURT: So the State is moving to dismiss the Indictment?
>
> MR. HERNDON: Yes, Your Honor.

[See Exhibit I at 4-5].

As a result, Carpenter pleaded guilty to the traffic offense of operating his motor vehicle while using a cellphone in violation of N.J.S.A. 39:4-97.3. [Id.] The remaining criminal and traffic charges were dismissed, but Carpenter was fined $400 plus court costs. As a result of being arrested and charged, he lost his job, health insurance, and suffered other ailments because of the public humiliation. [Id.]

Plaintiffs filed the Complaint [Dkt. No. 1] on June 22, 2018 alleging five counts: Counts I and II are constitutional claims against Chard (I) and a Monell Claim against Chief Farabella and the City of Millville (II), Count III alleges a claim under the NJCRA, Count IV Negligence and respondeat superior, and Count V is loss of consortium. Plaintiffs' constitutional claims against Chard are plead under the Fourth and Fourteenth, but do not clearly identify a right other than "Carpenter had a right not to be indicted based on perjured testimony." Plaintiff claims under Monell allege that the City has a custom of treating officers involved in aggressive police actions with little or no meaningful consequence for the offending police officer. Defendants filed a motion for summary judgment [Dkt. No. 30] on January 9, 2020.

Chard filed a counterclaim seeking personal injury damages because Carpenter assaulted him with his automobile. Plaintiff moves for summary judgment, [Dkt. No. 29] on Chard's personal injury counterclaim, on the grounds that Chard is beholden to the 'verbal threshold' and because Chard has not suffered an injury. Chard claims he sustained compensable personal injury as a result of actionable conduct by Carpenter and, based on the underlying facts and circumstances of this matter, Chard's Counterclaim for damages is not subject to the 'verbal threshold' defense.

## II.  <u>Standard of Review</u>

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> FED. R. CIV. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256–57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   **Discussion**

A. Defendants' Motion for Summary Judgment

1.  Claims against Defendant Chard

The Complaint alleges general violations of the Fourth and Fourteenth Amendments.  Plaintiffs argue in their briefs that the right to be free of an Indictment based on perjured testimony is old as the oath itself, which has been administered time out of mind in Anglo-American courts. Plaintiffs' state constitutional claims allege improper seizure and false arrest.  In sum, Patrolman Chard's false reports and grand jury testimony violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Id.

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).[1] Any analysis of 42 U.S.C. § 1983 should begin with the language of the statute:

---

[1] Plaintiffs' State Constitutional claims under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, follow the analysis under 42 U.S.C. § 1983. Hedges v. Musco, 204 F.3d 109, 121 n.12 (3d Cir. 2000); Pettit v. New Jersey, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983."). As a result,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.

As the above language makes clear, Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws. See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). By its own words, therefore, Section 1983 "does not . . . create substantive rights." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1)

---

the Court will analyze Plaintiff's state and federal constitutional claims concurrently, using the analysis under § 1983.

that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of his rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

There is no dispute that Chard was acting under the color of state law on the day of the incident and in his appearance before the grand jury. In addition, it is well settled that the right to be free from an indictment predicated upon false charges violates Plaintiffs' right to due process guaranteed by the Fourteenth Amendment. Black v. Montgomery Cty., 835 F.3d 358, 369 (3d Cir. 2016). In Black, the Third Circuit reaffirmed that "a plaintiff may pursue a fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment even if the plaintiff was never convicted." Id. (footnote omitted). The decision expanded on the precedent set in Halsey v. Pfeiffer, 750 F.3d 273, 292 (3d Cir. 2014), which considered the boundary between The Fourth Amendment, which "forbids a state from detaining an individual unless the state actor reasonably believes that the individual has committed a crime[,]" and The Fourteenth Amendment's protection which "protects defendants during an entire criminal proceeding through and after trial." Halsey v. Pfeiffer, 750 F.3d at 292 (citing Bailey v. United States, –––U.S. ––––, 133 S. Ct. 1031,

1037, 185 L.Ed.2d 19 (2013); Pierce v. Gilchrist, 359 F.3d 1279, 1285−86

(10th Cir. 2004) (quotation omitted)).

The Third Circuit in Halsey adopted the holding of the majority of

cases and held that

> "[w]hen falsified evidence is used as a basis to initiate the
> prosecution of a defendant, or is used to convict him, the
> defendant has been injured regardless of whether the totality of
> the evidence, excluding the fabricated evidence, would have
> given the state actor a probable cause defense in a malicious
> prosecution action that a defendant later brought against him. . .
> .. To the best of our knowledge, every court of appeals that has
> considered the question of whether a state actor has violated the
> defendant's right to due process of law by fabricating evidence
> to charge or convict the defendant has answered the question in
> the affirmative.

Id. (citing Whitlock v. Brueggemann, 682 F.3d 567, 585 (7th Cir.

2012) (collecting court of appeals cases).

The gravamen of Black centered on the decision in Halsey and

reaffirmed that the "fabricating evidence is an affront to due process of law,

and state actors seeking to frame citizens undermines fundamental fairness

and are responsible for "corruption of the truth-seeking process.'" Black,

835 F.3d at 370.

The question before the Court is whether Chard is entitled to qualified

immunity.  The doctrine of qualified immunity provides that "government

officials performing discretionary functions . . . are shielded from liability

for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person

should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus,

government officials are immune from suit in their individual capacities

unless, "taken in the light most favorable to the party asserting the injury, . .

. the facts alleged show the officer's conduct violated a constitutional right"

and "the right was clearly established" at the time of the objectionable

conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise

discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the

particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

     The doctrine of qualified immunity "balances two important

interests—the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably" and it

"applies regardless of whether the government official's error is a mistake

of law, a mistake of fact, or a mistake based on mixed questions of law and

fact. Id. (internal quotation omitted). Properly applied, qualified immunity

"protects 'all but the plainly incompetent or those who knowingly violate

the law.'" Ashcroft v. al-Kidd, 5623 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (3d Cir, 2006).

However, an officer is also entitled to qualified immunity "[i]f the officer's mistake as to what the law requires is reasonable[.]" Couden, 446 F.3d at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley, 475 U.S. at 341. See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.). Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

The qualified immunity analysis gives great deference "to the circumstances of police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Graham</u>, 490 U.S. at 396). <u>See</u> <u>also</u> <u>Graham</u>, 490 U.S. at 396-97 (analyzing reasonableness of use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

Here, there is no question that the right to be free from false charges and indictment predicated upon false testimony was clearly established on the day of the incident. <u>Black</u>, 835 F.3d at 370.  Chard does not argue that he was "mistaken" as to what the law requires.  The issue on qualified immunity is whether Chard "knowingly violate[d] the law'" when he charged Carpenter with aggravated assault by auto and offered testimony to support that charge, and other potential exaggerated charges, to the grand jury.  <u>Ashcroft v. al-Kidd</u>, 5623 U.S. at 743.   The Court reviews Chard's actions under an objective standard of reasonableness at the moment of the violations.   <u>Graham</u>, 490 U.S. at 396.  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect

may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

There are three separate video recordings of the interaction between Chard and Carpenter.  The Court has reviewed this evidence and finds that there are genuine issues of material fact related to whether Chard's characterization of the events in his police report and his grand jury testimony are objectively reasonable.  The video evidence consists of a recording from three different perspectives.  The central issue is whether Chard was dragged by Carpenter so as to justify the assault by auto charge, the eluding police charge, and others.  The videos raise questions as to whether Chard's claim that he was dragged is not only objectively reasonable, but truthful.  It is undisputed that Chard authored his police report before he reviewed, or allegedly even realized that such evidence existed, the three videos. For this reason, the Court cannot conclude that Chard's police report and grand jury testimony, which lead to Carpenter's arrest and indictment, are an objectively reasonable assessment of the events on January 22, 2018.  Thus, qualified immunity cannot attach at this time and summary judgment must be denied.

For the same reasons, summary judgment is denied as to the state law claims because there is a question of fact as to whether Chard's actions were taken in good faith. N.J.S.A. 59:3-3 (Under the Tort Claims Act, a public employee is not liable if he acts in good faith in the execution or enforcement of any law.); Bombace v. City of Newark, 241 N.J. Super. 1, 8 (App. Div. 1990).

### 2.  Claims Against Chief Farabella and the City of Millville

Plaintiff alleges claims unconstitutional policy and/or custom pursuant to Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978) against Chief Farabella and the City of Millville. Defendants move for summary judgment on the ground that Plaintiff has not produced sufficient evidence of the existence of a policy or custom.

Plaintiffs' claim that Chief Farabella has ratified a custom of "shock and awe" behavior by his police force which includes several examples of police misconduct in the use of force and his lack of action concerning the alleged attempt of Chard to enter Carpenter's vehicle and Chard's falsification of a police report and related grand jury testimony.

Of particular note are two arrests, which pre-date the underlying incident, that involve excessive force and aggressive "shock and awe" behavior.  First, Audra Capps suffered several broken ribs as a result of

excessive force employed by of Patrolman Dixon in the course of her arrest; Dixon pleaded guilty to aggravated assault. <u>See</u> Exhibit D.  Second, Alonzo Williams, suffered several fractures of his facial bones when Patrolman Profitt slammed his head to the concrete floor of the police station; Profitt pleaded guilty to aggravated assault. <u>See</u> Exhibit E.  Plaintiff argues that his injuries, while not physical in nature flow from similar police shock and awe tactics: Carpenter suffered the public disgrace and the humiliation of arrest and indictment, loss of employment, and loss of health benefits. Mrs. Carpenter has brought a loss of consortium claim.

A municipality is not liable under 42 U.S.C. § 1983 on a respondeat superior theory.  <u>Monell v. Dept. Soc. Servs. of New York</u>, 436 U.S. 658, 691 (1978).  However, a government entity may be liable for its agent's actions upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) (quoting <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981)); <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996).

Policy or custom may be established in two ways. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or

edict." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." <u>Id.</u> (citations omitted). Custom requires proof of knowledge and acquiescence by the decisionmaker. <u>McTernan v. City of York, PA</u>, 564 F.3d 636, 657 -658 (3d Cir. 2009).

Moreover, supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," or if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 129 (3d Cir. 2010) (citations omitted). Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." <u>Losch v. Parkesburg</u>, 736 F.2d 903, 910 (3d Cir. 1984).

Further, a plaintiff must show that the municipality acted with "deliberate indifference" to the known policy or custom.  <u>Canton v. Harris</u>, 489 U.S. 378, 388 (1989).  "A showing of simple or even heightened

negligence will not suffice." <u>Board of County Comm'rs of Bryan County, Okl. v. Brown</u>, 520 U.S. at 397, 407 (1997).  Finally, to prevail on a failure to train, discipline or control claim, a plaintiff must "show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." <u>Montgomery v. De Simone</u>, 159 F.3d 120, 127 (3d Cir. 1998) (citations omitted).

There are genuine issues of material fact related to whether Chief Farabella was deliberately indifferent to his officers' custom of using shock and awe tactics.  Despite happening after the Profitt and Dickinson assaults of their arrestees, there is no mention of the Carpenter incident in Chard's 2018 work performance evaluation.  <u>See</u> Exhibit H (Supplemental Report of John G. Peters, Ph.D., Dec. 11, 2019) at 11 (noting: "A content assessment of the evaluation instrument for the evaluation period November 1, 2017 through October 31, 2018 failed to include and/or comment on the arrest of Carpenter and the charges filed against him.").  Carpenter submits an expert report of John G. Peters[2] on the issues of police aggression and the

---

[2] Dr. Peters is a former Philadelphia police officer and is offered as an expert on use of force and police practices. He submitted two reports in this matter.

City's acquiescence to and tolerance of police misconduct. In addition to highlighting the absence of the Carpenter incident within Chard's 2018 work performance evaluation, Peters expanded on the systemic effect, and precursory activity, of such an omission:

> Chief Farabella testified on June 12, 2019 that he had recently received the Internal Affairs investigative report about the Chard-Carpenter incident and had "looked" at it (Farabella Deposition 41:12).  Although Chief Farabella had not yet made a decision about the Internal Affairs report findings, he testified the report did not call for Chard to be disciplined (43:19) and did not call for any remedial training of Chard. Exhibit J (Peters Preliminary Report) at 13.

Peters highlights that this testimony is at odds with Chief Farabella's acknowledgment that the video of the incident did not support Chard's allegation that he was "dragged across" the intersection by Carpenter:

> The Chief also has knowledge that Chard was not dragged across the street by Carpenter's vehicle (Farabella deposition, 62:13-14), and agreed the surveillance video footage did not show Chard "running" to stay with the pickup truck(73:13). Based upon video evidence, it was clear to the Chief that Chard had embellished or intentionally misrepresented the facts of the incident to make Chard look like the victim. Shockingly, Chief Farabella testified that he had no concerns with how Chard had handled the incident (39:11). Id.

In addition, Chard drafted his account of the incident in his police report before he was privy to the contents of, or allegedly even knew about the existence of, any of the video evidence. In that report, he recounts the incident as follows: "As soon as I grabbed the handle the driver attempted to pull away with my hand still attached. I was unable to let go fast enough

and was dragged across High Street to the east near the southeast corner."
<u>See</u> Exhibit K (Investigation Report) at 2. The resulting criminal complaint
alleges that Carpenter committed "the offense of assault by auto specifically
by knowingly and recklessly causing injury to Ptlm. Chard as he ordered
defendant to stop his vehicle. Defendant proceeded to drag Ptlm. Chard by
the door handle causing pain and injury to his right arm." <u>See</u> Exhibit L.

There is no dispute that if an internal affairs investigation into the
Carpenter incident occurred, Defendants did not disclose the results of the
investigation.  Plaintiffs claim this is further evidence of deliberate
indifference to a custom because either Chief Farabella was mistaken, and
no internal affairs ("IA") investigation of Chard was initiated or Defendants
have decided not to produce the IA report.  The lack of consequence,
despite Chief Farabella's apparent agreement that the videos do not
comport with Chard's description of the incident, creates a genuine issue of
fact as to whether a custom of protecting the officers who exercise their
authority in an excessive manor existed. Peters' Report expands on this
issue.

> Given the high frequency of use-of-force incidents by Millville
> police officers, several of these uses of force are likely to be
> excessive, but given Chief Farabella's demonstrated
> incompetency to conduct internal investigations, compile data,
> and discipline officers, he and the City of Millville repeatedly

> demonstrate how they ratify police officer misconduct and
> protect them. The result is an organizational culture that
> officers know will protect them when they engage in errant
> behavior, particularly in their uses of force.

<u>See</u> Exhibit H (Peters Supplemental Report) at 6.

> Peters further observed:

> If the Chief decided not to take any significant corrective action
> in an attempt to alter Chard's outrageous behavior, such
> behavior would have been ratified by the Chief, thereby creating
> or reinforcing an organizational atmosphere that intentionally
> protected his law enforcement officers.

<u>See</u> <u>id.</u>

To the extent that a fact-finder could conclude that Chard fabricated

or unjustifiably levied charges against Carpenter in an effort to exercise

power and also escaped any consequence for his alleged behavior, Peters

opines that the Chief's inaction and actions "coupled with that of the City of

Millville, show an organizational culture that clearly is biased toward

protecting Millville police officers and confirming that the City and the

police department administration have your back and will protect you –

even if police officers demonstrate outrageous behavior. <u>See</u> <u>id.</u>

(Supplemental Report) at 7. This is the very definition of a custom; a

genuine issue of fact exists as to whether Chief Farabella had "knowledge of

and acquiesced [to his] subordinates' violations." <u>Santiago v</u>, 629 F.3d at

129.  Summary judgment is denied.

B.  Plaintiffs' Motion for Summary Judgment on the Counterclaim

The Counterclaim alleges that Patrolman Chard was struck by the automobile operated by David Carpenter while Chard was on duty at a traffic control during a police emergency. Chard alleges that this was done intentionally, negligently and carelessly causing him permanent injuries, requiring the care and treatment of physicians, and medications.  He further argues that the pain and limitations will remain for the rest of his life and he will continue to suffer disruption to his daily routine. For these reasons, Chard seeks a judgment against David Carpenter for damages, including the total amount of any Worker's Compensation liens together with interest, counsel fees and the costs of suit.

Plaintiff moves for summary judgment on the ground that Chard's claims for non-economic recovery are foreclosed by the verbal threshold insurance restriction set forth in N.J.S.A. 39:6A-8(a).  That statute, colloquially referred to as the "verbal threshold," provides as follows:

"[A] person who is subject to this subsection... [who files suit] as a result of bodily injury, arising out of the ownership, operation, maintenance or use of such automobile in this State, [must prove that he or she] has sustained a bodily injury which results in death; dismemberment; significant disfigurement or significant scanning; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement. An injury shall be considered permanent when the body part or organ, or both, has not healed

to [function normally and will not heal to function normally with fu1ther medical treatment . . . [.]"

Under the Act, in order to recover non-economic damages, a Plaintiff subject to the verbal threshold must prove, by objective credible medical evidence, an injury falling  into  one or more of six categories: 1) death, 2) dismemberment, 3) significant disfigurement or scarring, 4) displaced fracture, 5) loss of a fetus, or 6) permanent injury within a reasonable degree  of medical probability.

The verbal threshold requires a two-part analysis. First, the "verbal threshold" is applicable to a named insured under a standard insurance policy who elects the verbal threshold as his option. N.J.S.A. 39:6A-8. Chard admits that he did select the verbal threshold on his personal policy of insurance in effect at the time of this incident. Thus, it is the second part of the analysis that is in dispute.

The second portion of the analysis asks whether the Plaintiff is required to maintain PIP coverage or has a right to receive PIP coverage through the policy of an immediate resident family member such as a spouse or parent. See, Koff v. Carubba, 290 N.J. Super 544 (App. Div.) certif. den. 146 NJ. 498 (1996); see also, Echeverri v. Blakely, 384 NJ.

Super 10, 16 (App. Div. 2006).  PIP coverage applies to "the named insured and members of his family residing in his household who sustained bodily injury as a result of an accident while occupying, entering into, alighting from or using an automobile, or as a pedestrian, caused by an automobile or by an object propelled by or from an automobile...[.]"Harbold v. Olin, 287 NJ. Super. 35, 38 (App. Div. 1996) (emphasis in original).

The facts underlying the interaction between the parties is documented in the discussion on Defendants' motion for summary judgment and will not be recounted here.  In addition, during oral argument, counsel narrowed the issue on this motion before the Court: the only issue is whether the verbal threshold applies to Chard.  If it does, Chard agrees he cannot sustain his burden of proving that the injuries he alleges are permanent.

In support of the motion, Carpenter claims that the verbal threshold applies to Chard's claim because at the time of Chard's alleged injury, he was either attempting to enter the vehicle or was a pedestrian.  Carpenter argues that either scenario entitles Chard to receive "PIP" benefits for any medical treatment resulting from this accident. Therefore, Chard satisfies both elements of the verbal threshold analysis and the verbal threshold applies to him as it relates to the subject accident.

26

Chard claims that he should not be subject to the verbal threshold provisions of his private automobile insurance policy, because he was "on duty" rendering his personal motor vehicle insurance inapplicable to his claim.  Chard relies on two New Jersey cases to support his conclusion that the legislative intent of the statute permits a case by case review of application of PIP. See Beaugard v. Johnson, 281 N.J. Super. 165 (App. Div. 1995) (15 year-old plaintiff passenger in a school bus determined not to be a person who had the right to receive PIP benefits because she was not injured while occupying 'an automobile', and therefore not bound by the verbal threshold of her father's automobile liability policy); Ibarra v. Vetrano, 302 N.J. Super. 578 (App. Div. 1997) (plaintiff mother of named insured determined not to be "an immediate family member" of household and therefore not subject to verbal threshold). Neither case compels the result Chard seeks. The decision in Beaugard turned on the fact that the vehicle at issue, a school bus, was not an automobile under the law.  In Ibarra, the court found that the plaintiff's relationship to the policy holder was to tenuous to warrant application of the verbal threshold.

Chard, nonetheless, claims that the legislative intent of N.J.S.A. 39:6A-4 permits his claim because he is not a traditional pedestrian, but a police officer injured while on duty.  Parsing the plain language of the

statute, Chard claims he was not "occupying, entering into, alighting from or using an automobile, or as a pedestrian[,]" when he sustained his injuries. His presence and conduct as a uniformed police officer, performing his law enforcement obligations of directing vehicular traffic while stationed within an intersection, are not the characteristics of a 'pedestrian'.

Chard offers no support for his claim that statutory interpretation of the word "pedestrian" should exempt his activities while on duty or for his policy argument that his injuries sustained during his police activity do not further the legislative intent of PIP.  PIP coverage applies to the named insured who sustained bodily injury as a result of "an accident while occupying, entering into, alighting from or using an automobile, or as a pedestrian, caused by an automobile[.]"  N.J.S.A. 39:6A-4.  PIP benefits advance the legislative policy injuries in automobile-related accidents should be quickly and effectively compensated, without regard to fault.

Even though Chard agrees that his hospital and medical expenses were paid by the workers compensation insurance provided by the City of Millville, so that compensation has already been quick and effective, his argument that he is exempt finds no support in his submissions.

Summary judgment is granted in favor of Carpenter.

28

## IV.   <u>Conclusion</u>

For the reasons stated above, Plaintiffs' Motion for Summary

Judgment [Dkt. No. 29] will be granted, and Defendants' Motion for

Summary Judgment [Dkt. No. 30] will be denied.

An appropriate Order shall issue.

Dated: September 30, 2020

s/ Joseph H. Rodriguez
HON. JOSEPH H. RODRIGUEZ,
United States District Judge